*Motor Vehicle Administration v. Rahq Deika Montana Usan*, No. 6, September Term, 2023.  Opinion by Hotten, J.


**MARYLAND TRANSPORTATION ARTICLE – DRIVER'S LICENSES – TEST REFUSAL –** The Supreme Court held that the Administrative Law Judge did not err in concluding that law enforcement had reasonable grounds to believe the detained individual was driving a vehicle while impaired by alcohol, drugs, or both.  The record as a whole provided substantial evidence such that a reasoning mind could reasonably reach the same conclusion.  The Court also held that the Administrative Law Judge did not err in concluding that law enforcement, having reasonable suspicion of a driver impaired by alcohol, drugs, or both, may request testing pursuant to Transportation Article § 16-205.1.  The Supreme Court affirmed that the driver violated Transportation Article § 16-205.1 by refusing to submit to the requested testing.  Accordingly, the Supreme Court reversed the Circuit Court for Charles County.

Circuit Court for Charles County
Case No.: C-08-CV-22-000278
Argued: November 3, 2023

IN THE SUPREME COURT

OF MARYLAND

No. 6

September Term, 2023

_____

MOTOR VEHICLE ADMINISTRATION

v.

RAHQ DEIKA MONTANA USAN

_____

Fader, C.J.,
Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

_____

Opinion by Hotten, J.
Biran, J., concurs.

_____

Filed: January 25, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

The Motor Vehicle Administration ("MVA") seeks review of a decision by the Circuit Court for Charles County, which overturned an Administrative Law Judge's ("ALJ") suspension of Rahq Deika Montana Usan's ("Mr. Usan") driver's license pursuant to Maryland's implied consent statute, Maryland Code Ann., Transportation Article ("Transp.") § 16-205.1.  The MVA alleges the circuit court committed error in "[m]aking [i]ts [o]wn [f]actual and [l]egal [f]indings," thereby "improperly substitut[ing] its judgment for the ALJ's[.]"  In response, Mr. Usan asserts that law enforcement had no grounds to request an alcohol breath test as a component of drug testing, because he was arrested under suspicion of driving under the influence of drugs, and there was no evidence that a Drug Recognition Expert ("DRE") was available to administer said drug testing.

We granted *certiorari* to answer the following question:

> Did the administrative law judge correctly find that reasonable grounds existed under Md. Code § 16-205.l of the Transportation Article for a law enforcement officer to request a motorist to take a test for alcohol concentration, despite there being no odor of alcoholic beverage on his breath and a preliminary breath test [with a] result [of] 0.00 alcohol content, but where the motorist was driving erratically[,] with indicia of intoxication to include horizontal gaze nystagmus and lack of coordination and balance?

For the reasons discussed below, we answer the question in the affirmative and reverse the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

*Factual Background*

On December 17, 2021 at 12:06 a.m., State Trooper First Class Jonathan Greathouse ("Trooper Greathouse") "observed a [r]ed Jeep . . . driving in an erratic manner[,] cross[ing] the solid white line" in Mechanicsville, St. Mary's County, Maryland.  Trooper Greathouse

made a traffic stop and identified Respondent, Mr. Usan, based on securing his identification. At the time of the stop, Mr. Usan resided in Maryland and possessed a Maryland-issued driver's license. Trooper Greathouse "observed [that Mr. Usan] was very disoriented[,] had glassy red eyes[, and] his movement was slow and sluggish." Mr. Usan denied drinking any alcohol.

Trooper Greathouse requested that Mr. Usan submit to three Standardized Field Sobriety Tests ("SFSTs"), including horizontal gaze nystagmus ("HGN"), walk and turn ("WAT"), and one leg stand ("OLS").[1] Mr. Usan did not successfully perform the field sobriety tests, as reflected in Trooper Greathouse's report noting "6/6" indications of impairment on HGN, "7/8" on WAT, and "3/4" on OLS. Although "at no point did [Trooper Greathouse] detect the odor of an alcoholic beverage[,]" he suspected Mr. Usan may be under the influence of alcohol. Mr. Usan "was offered a preliminary breath test" ("PBT") and blew "0.00" breath alcohol content ("BrAC"). "[Mr.] Usan was then arrested for driving under the influence of drugs and transported to the Maryland State Police Leonardtown Barrack for processing." Before leaving the scene, Trooper Greathouse asked a law enforcement officer from a different police department: "do you think you guys will have a [DRE] available or no?" The other police officer appeared to say no. Trooper Greathouse was not a DRE.

---

[1] HGN has subjects follow a ballpoint pen with their eyes to test eye movement and control. WAT has subjects walk a straight line in a heel-to-toe fashion to test coordination. OLS has subjects stand on one leg to test balance.

With Mr. Usan sitting in the police car, Trooper Greathouse played an audio recording of the DR 15.[2] The recording was very clear. Trooper Greathouse paused the recording to explain the DRE procedure that would take place if Mr. Usan consented to taking a test. However, Mr. Usan interrupted him and stated "yeah . . . we're not taking any tests." At this point, the recording resumed to play. At the end of the recording, Trooper Greathouse clarified that Mr. Usan could go home regardless of whether he took the test, but that a test would "take a little longer", and asked Mr. Usan if he would consent to a test. Mr. Usan replied, "not at this time."

Upon arrival at the barrack, Trooper Greathouse provided a DR 15 form to Mr. Usan. Mr. Usan signed the DR 15, refusing alcohol testing. Mr. Usan also verbally "refused to take the alcohol concentration test." Thereafter, Trooper Greathouse suspended Mr. Usan's license pursuant to Transp. § 16-205.1 for refusing to submit to the requested alcohol test.

Mr. Usan was also charged with violating Transp. § 21-902(a)(1)(i): driving while under the influence of alcohol; Transp. § 21-902(b)(1)(i): driving while impaired by alcohol; Transp. § 21-902(c)(1)(i): driving while impaired by drugs; Transp. § 21-901.1(b): negligent driving; Transp. § 21-901.1(a): reckless driving; and Transp. § 21-201(a)(1): failure to obey properly placed traffic control device instructions. The alcohol-related

---

[2] A "DR 15" is a standardized audio recording or form which advises motorists of their rights regarding alcohol and drug testing pursuant to Transp. § 16-205.1. The recording and form also provide relevant administrative penalties for refusing testing.

charges were later dropped. However, Mr. Usan's license suspension remained for refusing a requested alcohol test pursuant to Transp. § 16-205.1.

*Procedural Background*

On April 8, 2022, Mr. Usan appeared before ALJ Joy Phillips to contest his license suspension. Mr. Usan testified that he drove for Uber for 12 hours on the day in question and that he was driving under the speed limit and crossed over the solid white lines because he was tired. Mr. Usan denied he was under the influence of drugs or alcohol. Mr. Usan further claimed nervousness affected him during his SFSTs due to the arrival of additional officers.

Mr. Usan argued that there was no reason to request a test for alcohol in the absence of evidence of alcohol impairment. The ALJ explained her understanding that per department procedure, law enforcement conducts certified alcohol testing before any drug testing to "rule . . . out" alcohol as the cause for impairment. Mr. Usan confirmed his understanding of law enforcement procedure. However, he argued that an officer who is not certified as a DRE does not have the statutory authority to request drug testing. At no point did Mr. Usan argue before the ALJ that he was induced to refuse testing or that a DRE was completely unavailable.

The ALJ found by a "preponderance of evidence" that: Trooper Greathouse had reasonable grounds to believe Mr. Usan was driving while impaired by alcohol, drugs, or both; there was evidence of the use of alcohol, drugs, or both due to Trooper Greathouse's report of Mr. Usan's sluggishness, glassy eyes, and the SFSTs results; that "Trooper [Greathouse] administered a PBT with results of 0.00 BrAC"; and that Trooper Greathouse

4

arrested Mr. Usan for "driving under the influence of drugs, not alcohol." The ALJ also found that: "[Mr. Usan] said twice during the reading [of his rights] that he was not going to take any test[; and Trooper Greathouse] asked [Mr. Usan] if he would take a test and [Mr. Usan] responded, '[n]ot at this time.'" Further, "[a]t the station, [Mr. Usan] signed the DR 15 that he was refusing the alcohol test [and he] was never offered a drug test or an evaluation by a [DRE.]"

Relying on *Motor Vehicle Admin. v. Shea*, 415 Md. 1, 19, 997 A.2d 768, 778 (2010), and *Motor Vehicle Admin. v. Pollard*, 466 Md. 531, 540, 222 A.3d 177, 182 (2019), the ALJ articulated that the reasonable suspicion of an officer is a "common-sense, nontechnical conception" based on the officer's training and experience that is owed deference by the courts. Since Trooper Greathouse "supported his belief [that Mr. Usan] was under the influence of something with specific observations[,]" the ALJ concluded that Trooper Greathouse's suspicions provided reasonable grounds to request certified testing at the barracks.

The ALJ noted Mr. Usan's "objections to being offered an alcohol test when he was arrested for suspicion of drugs, but [observed that] the Transportation Article includes both tests if an officer has an objectively reasonable belief the driver is under the influence or impaired by something, whether it be alcohol or drugs." The ALJ determined that Mr. Usan's test refusal violated Transp. § 16-205.1, resulting in the suspension of Mr. Usan's driver's license for nine months with an alternative of twelve months of Ignition Interlock restrictions.

5

Mr. Usan petitioned for judicial review in the Circuit Court for Charles County,[3] where a hearing was held on November 29, 2022. Mr. Usan contended that the ALJ applied an incorrect standard because Trooper Greathouse needed "reasonable grounds that [Mr. Usan] was impaired by either alcohol and/or drugs . . . not just impaired by something." Additionally, Mr. Usan argued that the record did not provide "competent, material, and substantial evidence to support the ALJ's finding that" Trooper Greathouse had reasonable grounds to believe that Mr. Usan was under the influence or impaired by alcohol, drugs, or both. Mr. Usan asserted that there was no direct evidence of the presence of alcohol, so there was "no alcohol." Further, Mr. Usan argued that, while law enforcement *can* request both alcohol and drug testing depending on the context, "it was not proper to ask for or to request a [certified] breath test [for alcohol] based off of the evidence in the record." Mr. Usan also contended that, despite a police manual requirement stating otherwise, an officer could not request alcohol testing without any evidence of alcohol.

MVA argued that the standard of review was not *de novo*, but instead was whether there was "substantial evidence . . . to support the [ALJ's] decision" and whether the decision was legally correct. MVA pointed to the failed SFSTs and erratic driving as substantial evidence of Mr. Usan's impairment. MVA contended that the evidence sufficed "to support the ALJ's finding."

---

[3] Although the traffic stop at issue occurred in St. Mary's County, Mr. Usan petitioned for judicial review in Charles County. Mr. Usan resided at the time in Waldorf, Charles County, Maryland. Maryland Code Ann., State Government Article § 10-222(c) provides that, "[u]nless otherwise required by statute, a petition for judicial review [of a final decision of an administrative agency] shall be filed with the circuit court for the county where any party resides or has a principal place of business." So, venue was proper.

6

The circuit court acknowledged that it did not watch the dashcam videos of the incident. Instead, the court speculated on why Mr. Usan's "eyes looked red[]" and "bloodshot," noting that "there's a lot of reasons why somebody may be tired that is causing them – maybe he's falling asleep, I don't know." The circuit court then reiterated that

> if you're pulling someone over and you're suspecting that they're under the influence of alcohol and they blow a [.]00 and you don't have any other indication that he's under the influence of alcohol such as a bottle, empty bottle of liquor, the smell of alcohol, any kind of admission that [Mr. Usan] drank at some point during the day, people do make admissions, if you go to the, the idea that maybe he's on drugs, then, and there's no expert that is able to even give any indication that they believed that he may be, then that's just the officer guessing. And then you have people who may just be tired and driving, which is dangerous, but without indication. And then that blow of [.]00.

In short, the circuit court concluded that it did not "believe . . . that the decision was sustained by the evidence" and reversed Mr. Usan's suspension.

MVA timely appealed and we granted *certiorari*. *Motor Vehicle Admin. v. Usan*, 483 Md. 572, 296 A.3d 415 (2023).

## STANDARD OF REVIEW

A court's role in reviewing an administrative agency adjudicatory decision is narrow; it is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.

In applying the substantial evidence test, a reviewing court decides whether a reasoning mind reasonably could have reached the factual conclusion the agency reached. A reviewing court should defer to the agency's fact-finding and drawing of inferences if they are supported by the record. A reviewing court must review the agency's decision in the light most favorable to it; the agency's decision is prima facie correct and presumed valid, and it is the

7

agency's province to resolve conflicting evidence and to draw inferences from that evidence.

Despite some unfortunate language that has crept into a few of our opinions, a court's task on review is not to substitute its judgment for the expertise of those persons who constitute the administrative agency.

*Motor Vehicle Admin. v. Carpenter*, 424 Md. 401, 412–13, 36 A.3d 439, 446 (2012) (cleaned up).

"In applying this standard, we review the decision of the administrative agency, rather than the determination of the lower court, and will defer to the [ALJ]'s findings of fact and inferences drawn, insofar as supported by the record." *Id.* at 413, 36 A.3d at 446 (citation omitted). "We review an agency's decision that is premised upon the application and analysis of caselaw without deference to the agency's legal conclusions." *Pollard*, 466 Md. at 537, 222 A.3d at 180 (quotation omitted).

## DISCUSSION

The purpose of Maryland's implied consent statute, Transp. § 16-205.1, is "to reduce the incidence of [impaired] driving and to protect public safety by encouraging drivers to take [requested] tests[.]" *Motor Vehicle Admin. v. Shepard*, 399 Md. 241, 255, 923 A.2d 100, 108 (2007) (citation omitted). The statute provides that

[a]ny person who drives or attempts to drive a motor vehicle on a highway . . . in this State is *deemed to have consented . . . to take a test* if the person should be detained on suspicion of driving . . . while under the influence of alcohol, while impaired by alcohol, while so far impaired by any drug, any combination of drugs, or a combination of one or more drugs and alcohol that the person could not drive a vehicle safely, [or] while impaired by a controlled dangerous substance[.]

Transp. § 16-205.1(a)(2) (emphasis added).

8

"Test" means, unless the context requires otherwise:

1. A test of a person's breath or of 1 specimen of a person's blood to determine alcohol concentration;

2. A test or tests of 1 specimen of a person's blood to determine the drug or controlled dangerous substance content of the person's blood; or

3. Both:
   A. A test of a person's breath or a test of 1 specimen of a person's blood, to determine alcohol concentration; and

   B. A test or tests of 1 specimen of a person's blood to determine the drug or controlled dangerous substance content of the person's blood.

Transp. § 16-205.1(a)(1)(iii).

The statute, in relevant part, directs that a police officer that has "reasonable grounds to believe" a person is driving a motor vehicle while under the influence or impairment of alcohol, drugs, or any combination of both, is to detain the person, request that the person permit a test to be taken, and advise the person of the administrative sanctions that shall be imposed if testing is refused. Transp. § 16-205.1(b)(2)(i)–(iii).

If the motorist refuses requested testing, the statute directs the police officer to, among other things, confiscate and suspend the person's driver's license, inform the person that they have a right to timely request administrative review, and advise the person of the administrative sanctions that will be imposed upon an adverse finding upon review. Transp. § 16-205.1(b)(3)(i)–(vi).

At an administrative hearing in a test refusal case, the statute directs the ALJ to assess whether: the law enforcement officer had "reasonable grounds to believe" the motorist was driving under the influence or impairment of alcohol, drugs, or a combination

9

of the two; there was evidence the motorist used alcohol, drugs, or a combination of the two; the officer advised the motorist of their rights under the statute and possible administrative sanctions before requesting testing; and the motorist refused to take the requested test. Transp. § 16-205.1(f)(7)(i)(1)–(4). If each element is satisfied, the statute requires that the MVA "suspend or revoke the person's license[.]" Transp. § 16-205.1(f)(8)(i). In test refusal cases, for first-time offenders, the statute directs a 270-day suspension. Transp. § 16-205.1(f)(8)(v)(5)(A).

Transp. § 16-205.1(j) features specific provisions focused on drugs and controlled dangerous substances ("CDS"). It provides that a "test for drug or [CDS] content" may only be requested by a police officer if the "law enforcement agency of which the officer is a member has the capacity to have such tests conducted[.]" Transp. § 16-205.1(j)(1). Capacity to conduct these drug tests is limited to those types of officers designated within the statute as DREs. *See* Transp. § 16-205.1(j)(2)–(3). Transp. § 16-205.1(j) makes no provisions for alcohol testing.

I.   **The Record Contains Substantial Evidence to Support the Administrative Law Judge's Findings of Fact, and the ALJ's Legal Conclusions Bore no Error of Law.**

A.   The ALJ had Substantial Evidence for finding Trooper Greathouse had Reasonable Grounds to Believe Mr. Usan was Driving under the Influence.

At issue is whether the ALJ's conclusion that Trooper Greathouse had reasonable grounds to believe Mr. Usan was driving under the influence or impairment of alcohol, drugs, or both, was supported by substantial evidence. In *Shepard*, we held that, as used

10

in the implied consent statute, the phrase "reasonable grounds" means "reasonable articulable suspicion[.]"[4]  399 Md at 254, 923 A.2d at 107.

Here, the ALJ relied on *Shea*, 415 Md. at 19, 997 A.2d at 778, for the articulation of an officer's reasonable suspicion as a "common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act."  The ALJ also followed our instruction in *Pollard*, 466 Md. at 540, 222 A.3d at 182, to "consider the totality of the circumstances to determine whether the detaining officer had 'reasonable suspicion,' and [] give deference to the detaining officer's experience and training and his or her ability to infer from his or her observations."  The ALJ's articulation of reasonable suspicion presents no error of law.

Next, the evidence before the ALJ sufficiently supported the ALJ's finding that Trooper Greathouse had reasonable suspicion to believe that Mr. Usan was driving under the influence or impairment of alcohol, drugs, or both.  The ALJ's determination was based on an examination of the totality of the record, including Trooper Greathouse's report, reflecting his credible, unopposed observations that Mr. Usan: was driving erratically, crossing solid white lines, and driving under the speed limit; had red and glassy eyes; exhibited slow and sluggish movement; and failed three SFSTs.  Trooper Greathouse's report was further supported by dashcam footage documenting Mr. Usan's failed SFSTs.

---

[4] We have explained that "reasonable suspicion requires less in the way of quantity and quality of evidence than is required for probable cause and it falls considerably short of satisfying a preponderance of the evidence standard."  *Shea*, 415 Md. at 19, 997 A.2d at 778 (cleaned up); *see also Motor Vehicle Admin. v. Medvedeff*, 466 Md. 455, 468, 221 A.3d 955, 963 (2019).

11

We "defer to the [ALJ's] fact-finding and drawing of inferences if they are supported by the record." *Carpenter*, 424 Md. at 412–13, 36 A.3d at 446.

Although Trooper Greathouse did not detect an odor of alcohol and Mr. Usan's preliminary breath test result reflected an alcohol content of 0.00 on a PBT, such a result may be negative indicia of alcohol but is not determinative of actual influence or impairment and does not absolve drivers of complying with later-requested alcohol testing. Transp. § 16-205.2 (c) ("The results of the [PBT] shall be used as a guide for the police officer in deciding whether an arrest should be made[.]"), (d) ("[T]he taking of a [PBT] shall not relieve the individual of the obligation to take the test required under [Transp.] § 16-205.1[.]"); *Motor Vehicle Admin. v. Dove*, 413 Md. 70, 94, 991 A.2d 65, 79 (2010) ("The fact that the [PBT] . . . showed a reading of 0.00 is irrelevant to the analysis of whether Dove refused the required blood test.").

Presuming the ALJ's determination that Trooper Greathouse had reasonable suspicion of Mr. Usan's impairment by alcohol, drugs, or both as prima facie correct, a reasoning mind could reasonably conclude as the ALJ did. In other words, given Trooper Greathouse's reported observations of Mr. Usan's condition and the dashcam footage of Mr. Usan's failed SFSTs, the record contained substantial evidence to support the ALJ's conclusion that Trooper Greathouse had reasonable suspicion that Mr. Usan was driving under the influence or impairment of alcohol, drugs, or both.

> B.    The ALJ Correctly Interpreted Transp. § 16-205.1 as Permitting Law Enforcement to Request Alcohol Testing, Drug Testing, or Both if an Officer has a Reasonable Suspicion that a Driver is Under the Influence or Impaired by Alcohol, Drugs, or Both.

12

The ALJ also correctly interpreted Transp. § 16-205.1 in determining that a law enforcement officer has the ability to request alcohol testing, drug testing, or both if the officer has a reasonable suspicion that a driver was under the influence or impairment of alcohol, drugs, or both. "In interpreting a statute, a court first considers the statute's language, which the court applies where the statute's language is unambiguous and clearly consistent with the statute's apparent purpose." *Motor Vehicle Admin. v. Gonce*, 446 Md. 100, 110, 130 A.3d 436, 442 (2016) (cleaned up).

The Transportation Article provides, in relevant part:

> Any person who drives or attempts to drive a motor vehicle on a highway or on any private property that is used by the public in general in this State *is deemed to have consented . . . to take a test* if the person should be detained on suspicion of driving or attempting to drive while under the influence of alcohol, while impaired by alcohol, while so far impaired by any drug, any combination of drugs, or a combination of one or more drugs and alcohol that the person could not drive a vehicle safely, while impaired by a controlled dangerous substance, in violation of an alcohol restriction, or in violation of § 16-813 of this title.

Transp. § 16-205.1(a)(2) (emphasis added). The Transportation Article defines "test" as:

1. A test of a person's breath or of 1 specimen of a person's blood to determine alcohol concentration;

2. A test or tests of 1 specimen of a person's blood to determine the drug or controlled dangerous substance content of the person's blood; or

3. Both:
   A. A test of a person's breath or a test of 1 specimen of a person's blood, to determine alcohol concentration; and

   B. A test or tests of 1 specimen of a person's blood to determine the drug or controlled dangerous substance content of the person's blood.

13

Transp. § 16-205.1(a)(1)(iii).

The ALJ concluded that law enforcement officers had access to both testing procedures available in Transp. § 16-205.1, despite a lack of clarity as to whether Mr. Usan was under the influence or impairment of alcohol, drugs, or both. Based on the plain language of Transp. § 16-205.1, we agree with the ALJ. *Motor Vehicle Admin. v. Deering*, 438 Md. 611, 622, 92 A.3d 495, 502 (2014).

Under the plain language of Transp. § 16-205.1(a), a law enforcement officer with reasonable suspicion that a driver was under the influence or impairment of alcohol, drugs, or both may request alcohol testing, drug testing, or both. Nowhere does Transp. § 16-205.1(a) expressly or impliedly limit reasonable suspicion to either alcohol or drugs, or limit testing to only alcohol or only drugs, respectively. Instead, Transp. § 16-205.1(a) provides that drivers have consented to a test if suspected of driving under any of the varied options of influence or impairment, and then defines "test" as alcohol testing, drug testing, or both. In short, a person reasonably suspected of driving under only the influence or impairment of drugs or CDS has impliedly consented to alcohol testing, drug testing, or both. In reaching this conclusion, *Gonce* is helpful.

In *Gonce*, the driver had submitted to alcohol testing pursuant to Transp. § 16-205.1(a)(1)(iii) but refused to take subsequently requested drug testing, whereupon his license was suspended. 446 Md. at 109, 130 A.3d at 442. Gonce argued that the word "test" in Transp. § 16-205.1 indicated a singular testing requirement, which he had satisfied by submitting to the alcohol test, and refusal to submit to further drug testing did not

14

warrant his license suspension.  *Id.* at 109, 130 A.3d at 442.  We disagreed and explained

that,

> [b]y its plain language, [Transp.] § 16-205.1 gives law enforcement officers the authority to request that a person submit to a blood test for drugs or [CDS] and an alcohol concentration test, whether through breath or blood.  [Transp.] § 16-205.1's plain language does not expressly limit law enforcement officers to only one test; *i.e.*, [Transp.] § 16-205.1 does not state that law enforcement officers must elect which test to request or that only one test is to be permitted.  Stated otherwise, [Transp.] § 16-205.1 authorizes law enforcement officers to request an alcohol concentration test and a drug test, without any explicit language indicating that the tests are mutually exclusive.

*Id.* at 113, 130 A.3d at 444.

Here, Mr. Usan argues that the use of the singular word "test" and option of "both" in Transp. § 16-205.1(a)(1)(iii)(3) necessarily combines the separate alcohol and drug testing into "a [s]ingle [t]est [c]onsisting of [t]wo [c]omponents[]" when an individual is arrested for only suspicion of driving under the influence of drugs.  Mr. Usan contends this singular "drug" test would have required a DRE's presence for the alcohol component pursuant to Transp. § 16-205.1(j).  We disagree.  Even assuming a DRE was unavailable, a fact which is not shown by the record, nothing in the statute combines both testing procedures into one singular test.  Instead, Transp. § 16-205.1 provides availability to law enforcement to request testing for alcohol, or drugs, "*or* . . . [b]oth[]" testing options.  Transp. § 16-205.1(a)(1)(iii) (emphasis added).  Indeed, "the word 'test' does not mean only one test." *Gonce*, 446 Md. at 113, 130 A.3d at 444.[5]

---

[5] "The singular includes the plural and the plural includes the singular."  Md. Code Ann., General Provisions Article § 1-202.  In accord, Transp. § 16-205.1 grants access to either or both tests "unless the context *requires* otherwise[.]"  Transp. § 16-205.1(a)(iii)

(continued . . .)

15

Mr. Usan's argument that "test" and "both" in Transp. § 16-205.1(a)(1)(iii) reflects "a single test" comprised of two components is incorrect because the statute plainly indicates two separate testing procedures: a breathalyzer or blood test for alcohol, or a blood test or tests for drugs and CDS. If officers are limited to a single "test" for alcohol but can perform "[a] test or tests" for drugs and CDS, the testing procedures are functionally delineated. Transp. § 16-205.1(a)(1)(iii). Further illustrating functional separation is that alcohol can be tested by both breath or blood, where drugs and CDS can only be tested via blood. *Id.* The testing procedures are also separated for the very reason Mr. Usan notes: Transp. § 16-205.1(j) requires a DRE for any drug and CDS testing. Alcohol testing has no such statutory requirement.

Mr. Usan urges us to recognize that the requested alcohol testing here was a mere component of drug testing, necessitating a DRE. Regardless of whether some current police *procedures* may require that a DRE first examine the results of an earlier-in-time alcohol test before requesting any testing for drugs, Transp. § 16-205.1 makes no such *statutory* requirement. Police procedure may want or even require DREs to examine alcohol testing results in their evaluation, but that *procedure* does not combine both tests into a *statutory* singular one with two components.

---

(. . . continued)
(emphasis added). We have discussed the phrase "unless context requires otherwise" in relation to Transp. § 16-205.1(c)'s requirement to test a driver when in an accident that results in death or serious injury. *See Gonce*, 446 Md. at 123–25, 130 A.3d at 450–51. As in *Gonce*, "'unless the context requires otherwise' . . . does not affect [the] conclusion that the word 'test' may be taken to mean both an alcohol concentration test *and* a drug test[.]" *Id.* at 125, 130 A.3d at 451 (emphasis added).

Requesting an alcohol test initially as part of a particular law enforcement entity's procedure has no bearing on the language of Transp. § 16-205.1. Law enforcement procedure may vary in different areas of the State, among different types of organizations, and may change in the future. The General Assembly has instead granted officers access to separate testing procedures that neither statutorily rely on each other, nor functionally tie together. If Mr. Usan seeks a change to Transp. § 16-205.1's language, the correct venue is the General Assembly.

If we concluded that alcohol and drug testing were necessarily combined into a singular, two-part process when performing "both" testing options, a DRE would be required for even the preliminary alcohol test. However, alcohol testing does not require a DRE. *See* Transp. § 16-205.1(e). Indeed, *drug* recognition experts are only required pursuant to Transp. § 16-205.1(j) and testing requests for drugs or CDS. Irrespective of whether a DRE may rely on the result of alcohol testing in making a determination of drug or CDS influence or impairment, Transp. § 16-205.1(j) does not necessitate a DRE's presence for that alcohol test.[6]

In the case at bar, the ALJ concluded as a matter of law and relying on *Gonce*, that "the Transportation Article includes both tests if an officer has an objectively reasonable belief the driver is under the influence or impaired by something, whether it be alcohol or drugs." We agree with the ALJ. The ALJ's reliance on *Gonce* was well placed. Transp.

---

[6] The concurrence would ask that in the instance of a driver suspected of only drug impairment, before any alcohol test is requested, a DRE should be located. Op. at 3 (Biran, J., concurring). Transp. § 16-205.1 makes no such requirement.

17

§ 16-205.1's plain language provides that a "test" can mean testing for alcohol, testing for drugs and CDS, or both separate testing procedures, and our precedent confirms that interpretation.

In sum, the initial roadside suspicions of law enforcement are not conclusive of whether a driver was guilty of driving under the influence or impairment of only one of drugs or alcohol, or both. Instead, an officer's reasonable suspicions are either confirmed or denied by testing as designated by Transp. § 16-205.1 or other applicable statutes. *See Dove*, 413 Md. at 95, 991 A.2d 79–80 ("[Transp. § 16-205.1(a)(2)] does not require probable cause when an officer requests an alcohol concentration test . . . . Suspicion based on reasonable grounds is a lower standard than a preponderance of the evidence or probable cause.") (citation omitted).

We hold that the ALJ correctly concluded that Transp. § 16-205.1 allows for law enforcement with reasonable suspicion of a driver driving under the influence or impairment of alcohol, drugs, or both to request testing for alcohol, drugs, or both.

C.  The ALJ had Substantial Evidence in the Record to Correctly Conclude that Mr. Usan Refused Alcohol Testing in Violation of Transp. § 16-205.1.

In watching Trooper Greathouse's dashcam videos, the ALJ noted that Mr. Usan "said twice during the reading [of his rights] that he was not going to take any test." Further, "[a]fter the recording ended, [Trooper Greathouse] asked [Mr. Usan] if he would take a test and [Mr. Usan] responded[] '[n]ot at this time.'" Then, "[Mr. Usan] signed the DR 15 that he was refusing the alcohol test." In reviewing the record, we discover the same. Mr. Usan's verbal refusals and signed DR 15 suffice as "substantial evidence" such

18

that a reasoning mind could have reasonably concluded that Mr. Usan rejected the requested testing.

Next, in relevant part,

> a person may not be compelled to take a test. However, the detaining officer shall advise the person that, on receipt of a sworn statement from the officer that the person was so charged and refused to take a test, . . . the Administration shall: . . . [i]n the case of a person licensed under this title . . . [f]or a test refusal: . . . [f]or a first offense, suspend the driver's license for 270 days[.]

Transp. § 16-205.1(b)(1)(i)(5).

The plain language shows that a person licensed under the Transportation Article may refuse a requested test, but in that instance and upon first offense, their license shall be suspended 270 days. Alternatively, pursuant to Transp. § 16-205.1(g), a driver may request participation in the Ignition Interlock System. We agree with the ALJ's reading of Transp. § 16-205.1 as applied to Mr. Usan's test refusal and the imposition of a nine-month license suspension and take no issue with the alternative option of Mr. Usan using the Ignition Interlock System. Both are correct applications of the statute, and we find no error. We hold that Mr. Usan's license suspension was warranted for his refusal to submit to requested testing.[7]

---

[7] In his brief, Mr. Usan argues that Trooper Greathouse improperly induced him into refusing the alcohol concentration test, thereby negating his knowing refusal. Mr. Usan did not make this argument before the ALJ, nor did he raise this issue in a cross-petition for writ of certiorari. Accordingly, we shall not address it here. *See* Maryland Rule 8-131(b)(1) ("Unless otherwise provided by the order granting the writ of certiorari, in reviewing a decision rendered . . . by a circuit court acting in an appellate capacity, the Supreme Court ordinarily will consider only an issue that has been raised in the petition

(continued . . .)

19

**CONCLUSION**

We hold that the ALJ's determinations that Trooper Greathouse had reasonable grounds to believe that Mr. Usan was driving under the influence or impairment of alcohol, drugs, or both and that Mr. Usan refused requested testing were supported by substantial evidence such that a reasoning mind could reasonably reach the same conclusions of fact. We also agree with the ALJ's interpretation and hold that Transp. § 16-205.1 affords law enforcement the ability to request testing for alcohol, drugs, or both, when an officer has a reasonable suspicion that a driver is under the influence or impairment of alcohol, drugs, or both. Mr. Usan violated Transp. § 16-205.1 by refusing to submit to officer requested testing when he was reasonably suspected of driving under the influence or impairment of alcohol, drugs, or both. A nine-month suspension was warranted under the statute for that refusal. We affirm the ALJ's findings of fact and conclusions of law. Accordingly, we reverse the circuit court.

> **JUDGMENT OF THE CIRCUIT COURT FOR CHARLES COUNTY IS REVERSED. COSTS TO BE PAID BY RESPONDENT.**

---

(. . . continued)

for certiorari or any cross-petition and that has been preserved for review by the Supreme Court."); *Gonce*, 446 Md. at 126, 130 A.3d at 452 ("a court will review an adjudicatory agency decision solely on the grounds relied upon by the administrative agency.") (cleaned up); *Brodie v. Motor Vehicle Admin.*, 367 Md. 1, 4, 785 A.2d 747, 749 (2001) (declining to address a motorist's claim because it was never raised during the administrative hearing).

Circuit Court for Charles County
Case No. C-08-CV-22-000278
Argued: November 3, 2023

IN THE SUPREME COURT

OF MARYLAND

No. 6

September Term, 2023

_____

MOTOR VEHICLE ADMINISTRATION

v.

RAHQ DEIKA MONTANA USAN

_____

Fader, C.J.
Watts
Hotten
Booth
Biran
Gould
Eaves,

JJ.

_____

Concurring Opinion by Biran, J.

_____

Filed: January 25, 2024

Respectfully, I concur.

In general, the implied consent statute, Md. Code Ann., Transp. ("TR") § 16-205.1 (2020 Repl. Vol.), allows law enforcement to request alcohol testing, drug testing, or both upon reasonable suspicion of driving under the influence of alcohol, drugs, or both. I write separately to express concern about the following potential scenario: (1) An officer stops a motorist after observing the motorist driving erratically; (2) the motorist does not emit an odor of alcohol, but nevertheless fails standard field sobriety tests; (3) the motorist takes a preliminary breath test ("PBT") while the traffic stop is still in progress, which results in a 0.00 breath alcohol content reading; (4) the officer is aware that their agency does not have a drug recognition expert ("DRE") available to request and conduct a drug test of the motorist and, therefore, the officer knows that it will not be possible to administer a drug test to the motorist under TR § 16-205.1(j)[1]; and (5) the officer, expecting that the motorist would pass a test for alcohol if one were administered, makes comments to the motorist that induce the motorist to refuse to take the alcohol test, resulting in the suspension of the motorist's driver's license. Before this Court, Mr. Usan contends that this scenario unfolded in his case. However, Mr. Usan did not argue at the administrative hearing that

---

[1] Section 16-205.1(j)(1) provides that a drug test "[m]ay not be requested … by a police officer unless the law enforcement agency of which the officer is a member *has the capacity to have such tests conducted*[.]" (Emphasis added.) That "capacity" is fleshed out in subsection (j)(2), which provides, among other things, that a drug test may only be requested "by a police officer who is a trainee, has been trained, or is participating directly or indirectly in a program of training that is …[d]esigned to train and certify police officers as drug recognition experts[.]" *Id.* § 16-205.1(j)(2)(i). Thus, if a DRE or DRE trainee is not available to request a drug test, no drug test may be requested.

Maryland State Police Trooper First Class ("TFC") Jonathan Greathouse induced him to refuse the alcohol test. For this reason, I concur in the Court's judgment reversing the ruling of the Circuit Court.

Nevertheless, Mr. Usan's arguments regarding inducement, and the interplay between an alcohol test and a drug test in these circumstances, warrant comment here.[2] In my view, if an officer does not have reasonable grounds to believe that a motorist is impaired by alcohol – because, for example, the officer does not detect any odor of alcohol and the motorist's PBT yields a 0.00 breath alcohol content – then the officer should only ask the motorist to take an alcohol test if the officer's agency has a DRE available to request a drug test following the alcohol test.

### 1. An Officer May Ask a Motorist to Take an Alcohol Test Even if the Officer Only Suspects Impairment by Drugs.

As the Majority explains, subject to exceptions that do not apply here, a police officer who stops a motorist must ask the motorist to take a "test" if the officer has reasonable grounds to believe that the motorist has been driving or attempting to drive while under the influence of or impaired by alcohol, or while impaired by a drug or some combination of drugs and alcohol such that the motorist could not drive safely. TR § 16-205.1(b)(2). A "test" includes a breath or blood test to determine alcohol content,

---

[2] The attorneys who represented Mr. Usan in the administrative hearing and in the Circuit Court moved to strike their appearances on behalf of Mr. Usan in this Court. The Court granted counsel's motion before it ruled on MVA's petition for *certiorari*. After the Court granted review in this case, Mr. Usan's current attorneys agreed to represent him pro bono before this Court. They have represented Mr. Usan well, and they are to be commended for doing so free of charge.

a blood test to determine drug content, or both. *See id.* § 16-205.1(a)(1)(iii). I agree with the Majority that substantial evidence supported the ALJ's conclusion that there were reasonable grounds here to suspect impairment.

As I understand how these investigations proceed, an officer who suspects any kind of impairment will always request an alcohol test initially, either: (1) because the officer suspects the motorist's impairment is due, at least in part, to consumption of alcohol; or (2) because the officer suspects the impairment is due to drug use as opposed to alcohol, and the officer needs to test for alcohol to provide a data point for the DRE to consider as part of the DRE's determination whether to request a drug test. Nothing in the implied consent statute prohibits the second basis for requesting an alcohol test. The record reflects that TFC Greathouse only suspected Mr. Usan of being impaired by drugs. Nevertheless, TFC Greathouse was permitted to request that Mr. Usan take an alcohol test as a prelude to a drug test.

### 2. The Caveat: a DRE Must Be Available

But there needs to be a caveat. In my view, officers who only suspect impairment due to drugs should request an initial alcohol test only if their agencies have a DRE available to request a drug test following an alcohol test. If no drug test can be requested because no DRE is available, there is no need for the data point that an alcohol test would provide. In other words, an alcohol test serves no legitimate purpose where there is no reasonable suspicion that alcohol has contributed to impairment *and* there is no ability to test for drugs due to the unavailability of a DRE. In such a circumstance, an officer who suspects impairment by drugs but knows that cannot be proven might request an alcohol

test in the hope that the motorist for some reason will refuse the test and have their license suspended. An officer should not ask a motorist to take an alcohol test for this reason. Even more troubling, an officer might be tempted to request an alcohol test and – believing that the test will not return a positive result – try to induce the motorist to refuse the test. An officer must resist that temptation. Taking such an approach would convert the alcohol test from a tool to inform a future drug test into a tool for triggering automatic administrative consequences for the motorist.

The issues properly before an administrative law judge ("ALJ") in a test refusal case include "[w]hether the police officer requested a test after the person was fully advised ... of the administrative sanctions that shall be imposed[.]" TR § 16-205.1(f)(7)(i)(3). This Court has held that an officer who "in any way" induces a motorist into refusing a test has not "fully advised" the motorist. *Forman v. Motor Vehicle Admin.*, 332 Md. 201, 217-18, 223-24 (1993). In my view, a motorist who refuses an alcohol test may, in an appropriate case, raise the lack of capacity to conduct a drug test as part of a broader inducement argument. For this reason, it behooves law enforcement agencies, in the first instance, to document the availability of a DRE at the time an officer, who only suspects impairment based on drugs, requests an alcohol test. And MVA would be well advised to present such documentation at an administrative hearing in an alcohol test refusal case where a motorist raises the lack of capacity to conduct a drug test as part of an inducement argument.

Before this Court, Mr. Usan contends that TFC Greathouse induced his refusal to take the alcohol test. First, Mr. Usan asserts that the record reflects there was no DRE available at the State Police barracks to request that he take a drug test. He bases this

contention on an exchange that occurred between TFC Greathouse and officers from the local Sheriff's Department who had arrived on the scene after TFC Greathouse made the traffic stop:

> TFC Greathouse: Yeah. By any chance, would you guys – do you think you guys will have a DRE available or no?
>
> Sheriff's Deputy: Do we have any DREs on the squad?[3]
>
> TFC Greathouse: I'm just curious.

After an aside with Mr. Usan, there was an inaudible response from the Sheriff's Deputy or Deputies to TFC Greathouse's question concerning the DRE. TFC Greathouse then replied, "Okay. I was just checking. Okay. All right. Thank you."[4]

Mr. Usan then argues that, because TFC Greathouse knew there was no DRE available at the State Police barracks, TFC Greathouse made several statements to Mr. Usan designed to lead Mr. Usan to refuse an alcohol test. In particular, Mr. Usan points to

---

[3] It appears from the dashcam video footage that the Sheriff's Deputy at this point was asking other deputies present from his squad whether they had any DREs on the squad, as opposed to the Deputy repeating TFC Greathouse's question back to TFC Greathouse.

[4] Mr. Usan characterizes the above exchange as establishing that the State Police did not legally have capacity to conduct a drug test because a DRE was not available. MVA, however, states that TFC Greathouse was never actually "put to the task of locating a ... [DRE] from his, or any other law enforcement agency, because Mr. Usan refused the alcohol test." As discussed above, because TFC Greathouse only suspected impairment due to drugs, he should not have asked Mr. Usan to take an alcohol test if no DRE was available. I do not read the above-quoted exchange as establishing that a DRE was unavailable to respond to the State Police barracks if requested, and the record contains no other information on this point one way or another. Therefore, I cannot conclude that TFC Greathouse should not have asked Mr. Usan to take the alcohol test.

TFC Greathouse's explanation that taking a test would mean it would take longer for Mr. Usan to get home:

> TFC Greathouse: So I have to have your advice of rights read to you. You either have to say, yes, I'd like to take the test, or you don't want to take the test. Remember ... whatever you do, we'll still try to call you a ride afterwards.... [I]f you decide to take a test, it does take a little bit longer, okay? But that is something you have to make a decision for you alone, okay? I cannot tell you what you should or should not do. All I'm trying to tell you is that it just sometimes takes a little more extra time.
>
> * * *
>
> TFC Greathouse: You don't have to take any tests at all.
>
> Mr. Usan: Right.
>
> TFC Greathouse: You can say, heck, I ain't taking anything. Or you [can] say, sure, I would like to take a test, but no matter what, I still have to read your [advice of[5]] rights. Okay?
>
> Mr. Usan: I understand.

After the recorded advice of rights was played for Mr. Usan, TFC Greathouse again stated that taking a test would require more time and asked if Mr. Usan wanted to take a test:

> TFC Greathouse: [W]hether you decide you'd like to take the test at the barrack or whether you decide not to, no matter what, you can call a ride and you go home tonight. Okay? As long as you're being cooperative .... The only thing is if you decide to take a test, of course it's going to take a little longer. Okay. So I do have to ask you, would you like to consent to take the test or would you like not to?
>
> Mr. Usan: Not at this time.

---

[5] The transcript of the dashcam video footage refers to "advisory" rights at this spot. This appears to be a transcription error. TFC Greathouse clearly referred to giving Mr. Usan his "advice of" rights.

At the administrative hearing, Mr. Usan did not argue that TFC Greathouse induced his refusal to take the test. To the contrary, he volunteered in his testimony that he refused the alcohol test for other reasons: he believed (correctly) that his PBT had returned a result of 0.00, he did not understand why any further tests were necessary, and he was also uncomfortable during his interaction with the officers:

> I remember [TFC Greathouse] said we're doing more tests and I said I'm not doing more tests. Why – because I didn't understand how we were there. I blew zeros [on the PBT]. I passed the sobriety. What are we doing? And I was just uncomfortable with the whole – the whole interaction.

As a result, an inducement issue was not generated, and "a reviewing court ordinarily may not pass upon issues presented to it for the first time on judicial review and that are not encompassed in the final decision of the administrative agency." *Schwartz v. Md. Dept. of Nat. Res.*, 385 Md. 534, 555 (2005) (cleaned up).[6] For this reason, I concur in the Majority's disposition of this case. However, if Mr. Usan had testified that TFC Greathouse's comments concerning a test taking longer to complete caused him to refuse the alcohol

---

[6] Although Mr. Usan's counsel at the administrative hearing brought up the exchange between TFC Greathouse and the Sheriff's Deputies in which TFC Greathouse asked whether they had a DRE available, counsel did so to argue that "there couldn't have even been a blood test [for drugs] in this case because the observing officers were not DREs." Prior counsel's argument was incorrect. The observing officers did not have to be DREs themselves for a drug test to be requested. Rather, a DRE needed to be available to respond to the State Police barrack that night to request that Mr. Usan take a drug test.

test, the result might have been different, especially in light of the fact that MVA did not

establish a DRE was available to request a drug test.[7]

---

[7] MVA asserts that "[w]hether law enforcement 'had the capacity' to conduct a test is not an issue to be considered in an implied consent hearing" under TR § 16-205.1(f)(7)(i). When a motorist raises the lack of an available DRE in the context of a refusal to take an alcohol test, the motorist should not be understood to be arguing that the agency did not have the "capacity" to conduct an *alcohol* test. Rather, the issue is whether DRE unavailability supports an inference that the request for an alcohol test was not made in a good faith effort to gather evidence, but rather was part of an effort to induce a test refusal, given the lack of suspicion of alcohol consumption.

However, to the extent MVA contends that a motorist who refuses a *drug* test cannot raise an issue at an administrative hearing concerning an agency's lack of capacity to request a drug test, I disagree. An ALJ must consider whether the agency had the capacity to conduct a drug test when the issue is generated in that context. *See Motor Vehicle Admin. v. Krafft*, 452 Md. 589, 603-04 (2017) ("In a test refusal case, .... [u]sually, there is no dispute that the individual refused to take the test. Instead, the validity of the suspension often turns on whether the officer was authorized to ask the individual to take the test in the first place."). Of course, in *Krafft*, this Court was referring to reasonable grounds when it stated that an officer must be "authorized" to request a test, but the capacity to conduct a drug test is also a predicate for requesting one. *See* TR § 16-205.1(j)(1). So, if a motorist raises the issue of capacity to request a drug test – for example, if the motorist contends that the requesting officer was not a qualified DRE or DRE trainee, *see id.* § 16-205.1(j)(2) – my view is that the ALJ must consider it as part of determining "[w]hether the police officer requested a test[.]" *Id.* § 16-205.1(f)(7)(i)(3).

MVA is correct that many potential issues concerning law enforcement's handling of a traffic stop and/or the testing process are excluded from consideration at an administrative hearing in a test refusal case. *See, e.g.*, *Motor Vehicle Admin. v. Aiken*, 418 Md. 11, 31-33 (2011) (whether a qualified person administered a test using approved equipment under Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 10-304); *Motor Vehicle Admin. v. Jones*, 380 Md. 164, 228 (2004) (whether a chemical breath test for alcohol was taken within two hours of a motorist's apprehension under CJP § 10-303). However, I view law enforcement's capacity to conduct a drug test like the issue of inducement – it must be considered when properly generated. This is because, unlike the requirements at issue in the cases cited above, which are set forth in the Courts Article, § 16-205.1 itself makes the capacity to conduct a drug test an express predicate to requesting one, and §§ 16-205.1(f)(7)(i)(3) and (f)(8)(i)(3) include whether an officer requested a test as one of

the issues at a suspension hearing and one of the necessary findings to mandate suspension of a driver's license. For this reason, it is important that MVA make a record at an administrative hearing in a drug test refusal case regarding the law enforcement agency's capacity to conduct a drug test if the issue of such capacity is generated.